JOURNAL ENTRY AND OPINION
{¶ 1} The appellant, Robert Wazbinski, appeals the decision of the Lyndhurst Municipal Court, which denied his motion to suppress blood alcohol test results. Wazbinski was found guilty by a jury and sentenced for operating a motor vehicle while under the influence of alcohol, failure to maintain reasonable control of a motor vehicle, and a seat belt violation.
 {¶ 2} On June 10, 2001, Wazbinski took his adult son for a drive around Gates Mills Boulevard in his 2000 Dodge Viper convertible. Around 8:07 p.m., Wazbinski lost control of his Dodge Viper in light rain and crashed into a tree. He was thrown from the vehicle and suffered a broken right leg and significant head wounds.
 {¶ 3} Gates Mills Police Officers, Mele and Rocco, arrived at the accident scene around 8:10 p.m. and found Wazbinski and his son lying in the driveway at 6669 Gates Mills Boulevard. Wazbinski admitted to being the driver of the 2000 Dodge Viper. An ambulance was called, and Wazbinski and his son were transported to Hillcrest Hospital. After clearing the scene, Officers Rocco and Mele went to the hospital to do a follow-up investigation with Wazbinski.
 {¶ 4} When the officers arrived at the emergency room, they both smelled a strong odor of alcohol emanating from Wazbinski's breath. Wazbinski admitted to having had three or four glasses of wine with dinner just prior to the crash. He was charged with operating a motor vehicle while under the influence of alcohol and read BMV Form 2255, but was unable to sign the form due to his injuries.
 {¶ 5} Wazbinski agreed to provide a blood sample for alcohol testing. Christine Schkil, a registered nurse employed by Hillcrest Hospital, withdrew all blood samples into grey-topped vials. She withdrew the first of the blood samples by cleansing the extraction area with isopropyl alcohol and taking the sample directly from the IV line, but was informed that the sample was improperly taken for use in an investigation for driving while under the influence. Nurse Schkil then cleansed another area using a betadine swab and drew a second blood sample directly from Wazbinski's vein. The vials were handed to Officer Mele who, in turn, handed them to Officer Rocco.
 {¶ 6} Officer Rocco filled out the required information on the evidence bag and noted that the first blood sample was withdrawn at 9:49 p.m. and the second sample at 10:08 p.m. However, Nurse Schkil labeled the vials with Wazbinski's information and noted that the first sample was withdrawn at 9:53 p.m. and the second sample at 10:17 p.m. Officer Mele's testimony about the time the blood was withdrawn is consistent with Nurse Schkil's time notations.
 {¶ 7} Officer Rocco left Hillcrest Hospital around 10:45 p.m. with Wazbinski's blood samples in his briefcase. He was then called to a second accident scene where he remained for two-and-one-half hours. During this time, Wazbinski's blood samples were locked in Officer Rocco's brief case, which remained inside the police vehicle. Officer Rocco did not deliver the blood samples to the Cuyahoga County Coroner's Office until 1:54 a.m. on June 11. Officer Rocco acknowledges the blood samples were not refrigerated until they were delivered to the Coroner's office.
 {¶ 8} Wazbinski was charged at the hospital for violations of the following Gates Mills Ordinances ("G.M.O."): 334.01(A)(1), operating a motor vehicle while under the influence ("OMVI"); 334.025, failure to maintain reasonable control of a motor vehicle; and 338.29, a seat belt violation. These charges where assigned Lyndhurst Municipal Court Case No. 01 TRC 07532.
 {¶ 9} On June 18, 2001, Wazbinski's counsel entered a plea of not guilty with the court, requested discovery, and waived his client's rights to a speedy trial. The Village responded to this discovery request on July 2, 2001.
 {¶ 10} After receiving the results of Wazbinski's blood tests from the Cuyahoga County Coroner on July 3, 2001, the Gates Mills Police Department charged Wazbinski with operating a motor vehicle with a prohibited blood alcohol level ("BAC"), in violation of G.M.O. 334.01(A)(2). The first blood sample tested at .127, while the second sample tested at .109; both samples tested over the legal limit of .100. This additional charge was assigned Lyndhurst Municipal Court Case No. 01 TRC 08443[1], and on July 5, 2003, Wazbinski's counsel entered a plea of not guilty with the court and requested discovery, but did not waive his client's right to a speedy trial.
 {¶ 11} On August 17, 2001, Wazbinski made a second discovery request and filed a motion to suppress the blood alcohol tests. On August 31, 2001, the Village responded to Wazbinski's July 5 and August 17 discovery requests.
 {¶ 12} A suppression hearing was held on April 29, 2002 and was continued until May 30, 2002, due to the trial court's other caseload commitments. After receiving evidence and hearing witness testimony, the trial court denied Wazbinski's motion to suppress.
 {¶ 13} On August 28, 2003, the day of trial, Wazbinski argued a motion to dismiss based on a speedy trial violation. After the trial court denied his motion, Wazbinski attempted to proffer a plea of no contest to the charges of operating a motor vehicle with a prohibited blood alcohol level, failure to maintain reasonable control of a motor vehicle, and the seat belt violation. The trial court refused to accept the plea, and a three-day jury trial began. Wazbinski was found guilty by the jury on all four charges.
 {¶ 14} The trial court proceeded to sentence Wazbinski for OMVI, failure to maintain reasonable control of a motor vehicle, and failure to wear a seat belt. The trial court entered an order of nolle prosequi to the BAC conviction as an allied offense of similar import to the OMVI conviction. Wazbinski brings this timely appeal.
 {¶ 15} The appellant presents five assignments of error for our review.
 {¶ 16} "I. The trial court erred to the prejudice of the defendant-appellant in finding the officer had probable cause to arrest the defendant-appellant for driving under the influence of alcohol."
 {¶ 17} In State v. Lloyd (1998), 126 Ohio App.3d 95, the court stated:
 {¶ 18} "Our standard of review with respect to motions tosuppress is whether the trial court's findings are supported by competent, credible evidence. See State v. Winand (1996),116 Ohio App.3d 286, 688 N.E.2d 9 citing Tallmadge v. McCoy (1994),96 Ohio App.3d 604, 645 N.E.2d 802. * * * This is the appropriate standard because `in a hearing on a motion to suppress evidence, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate the credibility of witnesses.'State v. Hopfer (1996), 112 Ohio App.3d 521, 679 N.E.2d 321. However, once we accept those facts as true, we must independently determine, as a matter of law and without deference to the trial court's conclusion, whether the trial court met the applicable legal standard."
 {¶ 19} The appellant presents two issues for review in his first assignment of error. He first argues that the police officers who charged him with OMVI on June 10 lacked probable cause to arrest him solely based on the odor of an alcoholic beverage and his admission to drinking. Second, he claims his consent to the blood alcohol test was invalid because the police officers read him the BMV Form 2255 without first placing him under arrest.
 {¶ 20} We will first address the issue of probable cause. The court, in State v. Homan (2000), 89 Ohio St.3d 421, 427, reiterated the following standard to determine probable cause for arrest in a driving while under the influence case:
 {¶ 21} "In determining whether the police had probable cause to arrest an individual for DUI, we consider whether, at the moment of arrest, the police had sufficient information, derived from a reasonably trustworthy source of facts and circumstances, sufficient to cause a prudent person to believe that the suspect was driving under the influence. Beck v. Ohio (1964), 379 U.S. 89, 91, 85 S.Ct. 223, 225,13 L.Ed.2d 142, 145; State v. Timson (1974), 38 Ohio St.2d 122, 127, 67 Ohio Op.2d 140, 143, 311 N.E.2d 16, 20. In making this determination, we will examine the `totality' of facts and circumstances surrounding the arrest. See State v. Miller (1997), 117 Ohio App.3d 750, 761,691 N.E.2d 703, 710; State v. Brandenburg (1987), 41 Ohio App.3d 109,111, 534 N.E.2d 906, 908."
 {¶ 22} In the instant matter, Officer Rocco testified that the appellant smelled of alcohol at the scene of the accident. However, the appellant was seriously injured and required immediate medical attention; therefore, Officers Mele and Rocco first attended to the medical needs of the appellant until the ambulance arrived, then proceeded to clean up and process the accident scene. When the officers were finished at the accident scene, they proceeded to Hillcrest Hospital for a follow-up investigation into the details of the accident.
 {¶ 23} When the officers entered the emergency room where the appellant was being treated, they both immediately smelled a strong odor of alcohol coming from the appellant. When the appellant was questioned, he admitted to being the driver of the vehicle and also to having had three to four glasses of wine with dinner. Given the admissions made by the appellant, the strong odor of alcohol emanating from his breath, and the fact that the appellant caused a serious accident while operating a motor vehicle, Officers Mele and Rocco had sufficient probable cause to arrest him and request a blood alcohol test.
 {¶ 24} When examining the facts of this case under the totality of the circumstances, we find that Officers Mele and Rocco had probable cause to conduct a warrantless arrest and to ask the appellant to consent to a blood alcohol test.
 {¶ 25} Next, we will examine the appellant's claim that he was not placed under arrest prior to Officer Mele reading BMV Form 2255 to him, as required by R.C. 4511.191; thus, his consent to the blood draw and the results obtained should have been suppressed.
 {¶ 26} R.C. 4511.191 provides:
 {¶ 27} "(A) Any person who operates a vehicle upon a highway or any public or private property used by the public for vehicular travel or parking * * * shall be deemed to have given consent to a chemical test or tests of the person's blood * * * for the purposes of determining the alcohol * * * content of the person's blood * * * if arrested for operating a vehicle while under the influence of alcohol or for operating a vehicle with a prohibited concentration of alcohol in the blood, breath, or urine." (Emphasis added.)
 {¶ 28} The language of R.C. 4511.191 specifically provides that an arrest is necessary prior to reading BMV Form 2255 and requesting alcohol testing from a suspect. In the instant matter, it is undisputed that the appellant was read BMV Form 2255 and then consented to a blood alcohol test. The sole question at issue is whether the police officers placed the appellant under arrest prior to reading him BMV Form 2255. Both Officers Mele and Rocco testified the appellant was placed under arrest when read the BMV Form 2255; however, the exact timing is unclear. It is undisputed that Officer Mele actually read BMV Form 2255 to the appellant. Therefore, the testimony of Officer Mele concerning the time of arrest is most relevant. The following colloquy occurred between the prosecution and Officer Mele:
 {¶ 29} "A. At that point it was determined that alcohol had played a role in the accident.
 {¶ 30} "Q. What did you do?
 {¶ 31} "A. He was placed under arrest for driving under the influence.
 {¶ 32} "Q. Physically?
 {¶ 33} "A. No. We weren't able to physically place him under arrest.
 {¶ 34} "Q. How did you place him under arrest?
 {¶ 35} "A. He was told he was being charged with driving under the influence."
 {¶ 36} The following exchange occurred between appellant's counsel and Officer Mele during cross examination:
 {¶ 37} "Q. Did you arrest Mr. Wazbinski based solely upon the odor of alcohol and the admission he had been drinking at dinner; is that correct?
 {¶ 38} "A. As well as the accident scene, as well as there was an accident.
 {¶ 39} "Q. Okay. Nothing else that was — those are the factors that lead you to arrest Mr. Wazbinski?
 {¶ 40} "A. That's correct.
 {¶ 41} "Q. Okay. Then you asked him to (inaudible) you read the 2255 to him; is that correct?
 {¶ 42} "A. Yes, I did."
 {¶ 43} When examining the above testimony, the order of events becomes apparent. Officer Mele obviously arrested the appellant for driving under the influence, then read BMV Form 2255 to him.
 {¶ 44} We find, after reviewing the trial transcript, that the appellant was in fact first placed under arrest for driving under the influence, read BMV Form 2255, and then gave his actual consent for the blood alcohol test. Therefore, the appellant's first assignment of error is without merit and is hereby overruled.
 {¶ 45} "II. The trial court erred to the prejudice of the defendant-appellant in allowing the admission of the results of the blood tests into evidence when the tests were not shown to be taken in compliance with the guidelines and regulations promulgated by the ohio department of health."
 {¶ 46} The appellant presents three issues for review in his second assignment of error, all of which relate to proper compliance for blood alcohol testing as set forth in Ohio Adm. Code 3701-53-05. First, he claims the blood samples were not drawn with a sterile, dry needle into a vacuum container containing a solid anticoagulant. Second, he argues the blood samples were not properly refrigerated while not in transit. Last, he claims that the blood samples were not withdrawn within two hours of the violation.
 {¶ 47} Since the appellant's BAC, or (A)(2) conviction, was nolled by the trial court, and he was only convicted and sentenced for OMVI, or an (A)(1) violation, any arguments relating to the BAC conviction will not be addressed by this court.
 {¶ 48} First, the appellant relies on the testimony of Nurse Schkil to establish a claim that the blood samples were withdrawn into grey-topped vials that did not contain a solid anticoagulant.
 {¶ 49} The Ohio Department of Health requires that blood for alcohol testing shall be drawn into a vacuum container with a solid anticoagulant or according to the laboratory protocol as written in the laboratory procedure manual based on the type of specimen being tested. Ohio Adm. Code 3701-53-05(C).
 {¶ 50} Nurse Schkil testified she saw nothing inside the grey-topped vials prior to withdrawing blood from the appellant. However, when questioned further, she testified she really did not know or could not remember what was inside the vials, she only knew the grey-topped vials were used to withdraw blood for alcohol testing.
 {¶ 51} Amanda Jenkins, Chief Toxicologist, and Troy Merrik, the toxicologist who tested the appellant's blood sample at the Cuyahoga County's Coroner's Office, both testified that the grey-topped vials used for alcohol testing contain an anticoagulant and preservative. They further testified that the anticoagulant and preservative are actually sodium chloride and potassium oxalate, which may appear as an off-white powder at the bottom of the vials. Troy Merrick testified that the blood samples he received to test were in good condition, further bolstering the proposition that an anticoagulant was present in the grey-topped vials. Based on the record and the testimony of the witnesses, we find the vials used to collect the appellant's blood contained an anticoagulant, as required by Ohio Adm. Code 3701-53-05(C).
 {¶ 52} Second, the appellant argues the blood samples were not properly refrigerated while not in transit, as required by Ohio Adm. Code3701-53-05(F), which mandates "while not in transit or under examination, urine and blood specimens shall be refrigerated at a temperature of 42 degrees Fahrenheit or below."
 {¶ 53} In State v. Plummer (1986), 22 Ohio St.3d 292, 294, the Ohio Supreme Court held a failure to refrigerate a blood sample for five hours is well within the range of substantial compliance. Further, the defendant had failed to show any prejudice from the lack of refrigeration of the blood sample for five hours. It has been observed that such a delay actually benefits a defendant, as refrigeration retards the evaporation of alcohol. Id. at 295, fn. 2; State v. Mckinnon (1987),38 Ohio App.3d 28, 30.
 {¶ 54} In the instant matter, Officer Rocco testified he left Hillcrest Hospital at 10:45 p.m., was called to another accident scene and did not deliver the appellant's blood samples to the Coroners's Office until 1:54 a.m. During this three-hour span, the blood samples remained unrefrigerated and inside Officer Rocco's briefcase, which was locked in his patrol car. We find that failure to refrigerate the appellant's blood samples for three hours constitutes substantial compliance with Ohio Adm. Code 3701-53-05(F). Furthermore, the appellant failed to demonstrate any prejudice occasioned by the non-refrigeration because the alcohol test results could potentially have been higher than if his sample were properly refrigerated.
 {¶ 55} Third, the appellant claims the blood samples were not withdrawn within two hours of the violation, as required by R.C.4511.19(D)(1). In a criminal prosecution for driving under the influence of alcohol, in violation of R.C. 4511.19(A)(2), (3), or (4), the results of a properly administered bodily substances test may be admitted into evidence only if the bodily substance was withdrawn within two hours of the time of the violation. Newark v. Lucas (1988), 40 Ohio St.3d 100. However, for violations of R.C. 4511.19(A)(1), the State may introduce blood results obtained outside the two-hour time limit if expert testimony is used to relate the results of the test back to the actual time of the violation, as well as to relate the numerical figure representing a percentage of alcohol by weight in the bodily substance, as shown by the results of the chemical test, to the common understanding of what it is to be under the influence of alcohol. Id. at 104-105.
 {¶ 56} "In prosecutions for violations of R.C. 4511.19(A)(1), the amount of alcohol found as a result of the chemical testing of bodily substances is only of secondary interest * * *. The defendant's ability to perceive, make judgments, coordinate movement, and safely operate a vehicle is at issue in the prosecution of a defendant under such section. It is the behavior of the defendant which is the crucial issue. The accuracy of the test is not the critical issue as it is in prosecutions for per se violations." Id. at 104.
 {¶ 57} It is undisputed that G.M.O. 334.01(A)(1) and (A)(2) mirror the language found in R.C. 4511.19(A)(1) and (A)(2). Since the BAC, or (A)(2) conviction, was nolled by the trial court, we will focus on whether the admission of the blood results outside the two-hour limit were admissible for their probative value as it relates to the OMVI, or (A)(1) conviction.
 {¶ 58} In the instant matter, discrepancies exist in the times the first and second blood samples were withdrawn. Officer Rocco, who filled out the evidence bag containing the appellant's blood samples, marked the first sample as being withdrawn at 9:49 p.m. and the second sample as being withdrawn at 10:08 p.m. However, Officer Mele and Nurse Schkil testified that the first blood sample was withdrawn at 9:53 p.m., and the second sample was withdrawn at 10:17 p.m. Testimony is unclear as to the exact time of the accident. The accident was reported to the police dispatcher at 8:07 p.m. Depending on which testimony is correct, the second blood sample should have been withdrawn by 10:07 p.m. at the latest.
 {¶ 59} Another issue exists as to the admissibility of the first blood sample because Nurse Schkil testified she cleansed the IV line with isopropyl alcohol before withdrawing the sample. The first blood sample was withdrawn within the two-hour time limit. It is undisputed that the second blood sample extracted by Nurse Schkil was properly withdrawn by cleansing the extraction area using a betadine swab. It is also undisputed that both blood samples tested over the legal limit of .100.
 {¶ 60} After reviewing the record, we find that both blood samples were properly taken and admitted in support of an (A)(1) conviction.
 {¶ 61} First, although isopropyl alcohol was used to cleanse the extraction area for the first blood sample, the toxicology analysis performed by Troy Merrick revealed the absence of isopropyl, which is mutually exclusive and distinguishable from ethanol on a gas chromatograph. Amanda Jenkins, the Chief Toxicologist, also testified that isopropyl alcohol would have no effect on the outcome of a blood alcohol test for ethanol. Since isopropyl can be distinguished from ethanol with a gas chromatograph, we find no error in admitting the blood alcohol test results from the first sample taken within the two-hour limit.
 {¶ 62} Next, regardless of whether the second sample was withdrawn at 10:07 p.m. or 10:17 p.m., it may have been withdrawn past the two-hour time limit for blood extraction as required by law. It is unclear from the record whether the accident occurred at exactly 8:07 p.m. or a few minutes before. Regardless, the test results are still admissible for their probative value and as additional evidence towards an (A)(1) conviction. The Chief Toxicologist, Amanda Jenkins, testified as an expert witness and provided the proper foundation for admissibility for the second sample.
 {¶ 63} Appellant's second assignment of error is overruled in whole because the State demonstrated substantial compliance with the Ohio Adm. Code and Ohio Revised Code as they relate to blood alcohol testing standards for an (A)(1) conviction. The appellant has failed to present evidence that the State's substantial compliance caused any sort of prejudice evidenced by scientific inaccuracy, unreliability, or invalidity given the facts or circumstances of this case.
 {¶ 64} "III. The trial court erred when it admitted the result of the blood test into evidence when a proper chain of custody had not been established."
 {¶ 65} The appellant argues that the trial court erred by admitting the blood alcohol test results into evidence because the proper foundation for admission of those results had not been established, and the proper labeling was not present. The appellant specifically argues that the chain of custody form completed at the Cuyahoga County Coroner's Office does not indicate that the blood samples tested were the same samples taken from the appellant.
 {¶ 66} In Cleveland v. Harmon (Nov. 24, 1993), Cuyahoga App. No. 64139, this court addressed the chain of custody requirements needed for blood sample testing. This court held, "proof of the identity of a specimen does not require the testimony of each person who handled the specimen or its container. The State need only show that the specimen remained in an unchanged condition from the time it was withdrawn until it was analyzed. This may be done by showing that the container and its label and seal were in the same condition at both times." In other words, the State need only establish that the vials were not substituted or altered, or tampering did not occur.
 {¶ 67} We find the appellant's argument unpersuasive. Nurse Schkil testified she withdrew the blood samples from the appellant and wrote the appellant's name, the date, and her name directly on the vials. She then put another label on the vial which contained the time, the appellant's name, information, and his medical record number. Nurse Schkil then sealed the top of each vial and handed all samples to Officer Mele. Officer Mele then handed the vials to Officer Rocco. Officer Rocco put the vials into an evidence bag, sealed it, and then delivered the bag to the Coroner's office. At the Coroner's office, the samples were received by Rachel Fontono and stored in a refrigerator until opened and tested by Troy Merrick. There is no doubt that the blood-filled vials drawn from the appellant are the same vials that were tested by Troy Merrick. Even though the chain of custody form was not completed properly at the Coroners office, we can still trace the path of the appellant's blood sample from extraction to testing.
 {¶ 68} Because the BAC conviction, in violation of G.M.O. 334.01(A)(2), was nolled by the trial court, the defendant was never sentenced for that crime; therefore, he was never convicted, even though a jury found him guilty of the offense. The appellant's fourth and fifth assignment's of error are hereby rendered moot[2].
Judgment affirmed.
Patricia A. Blackmon, P.J., and Ann Dyke, J., Concur.
[1] The appellee, Village of Gates Mills, claims the appellant's court reporter failed to transcribe the court's explanation prior to the start of the jury trial that this later charge was to be included as count "D" to Case No. 01 TRC 07532; however, it does not appear anywhere in the record, and we will not address it.
[2] Assignment of Error VI: "The trial court violated mr. wazbinski's right to a speedy trial when it brought him to trial on the charge of driving with a prohibited alcohol concentration in his blood more than one year after the service of the summons/ticket."
Assignment of Error V: "The trial court erred when it failed to permit the appellant to plead either no contest or guilty to the prohibited concentration of alcohol charge."