[Cite as *State v. Harris*, 2024-Ohio-5947.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellant | : | C.A. No. 30174 |
| | : | |
| v. | : | Trial Court Case No. 2023 CR 1432 |
| | : | |
| JAQUANTA DENISE HARRIS | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on December 20, 2024

. . . . . . . . . . .

MATHIAS H. HECK, JR., by SARAH H. CHANEY, Attorney for Appellant

JOHN S. PINARD, Attorney for Appellee

. . . . . . . . . . . .

LEWIS, J.

**{¶ 1}** Appellant State of Ohio appeals from an order of the Montgomery County Common Pleas Court granting a motion to suppress filed by Defendant-Appellee Jaquanta Denise Harris. For the reasons that follow, we will affirm the judgment of the

trial court.

I.      Facts and Course of Proceedings

{¶ 2} On June 13, 2023, a Montgomery County grand jury indicted Harris on one count of operating a vehicle while under the influence (with three priors in ten years), a fourth-degree felony in violation of R.C. 4511.19(A)(1), and one count of operating a vehicle while under the influence (three or four priors in ten years; test refusal), a fourth-degree felony in violation of R.C. 4511.19(A)(2).   The indictment involved a May 6, 2023 traffic stop.

{¶ 3} On October 30, 2023, Harris filed a motion to suppress "any and all evidence of the charges of Driving Under the Influence."   In particular, Harris moved to suppress (1) observations and opinions of the police officers who stopped, arrested, and observed Harris regarding her sobriety and alcohol level; and (2) the police results and observations related to probable cause to stop and arrest Harris.

{¶ 4} On January 12, 2024, the trial court held a hearing on the motion to suppress. Patrol Sergeant James Gallagher of the City of Dayton Police Department testified as follows at the hearing.   Tr. 4-18.   He had been a patrol sergeant for about one year and ten months.   Prior to that, he was a patrol officer.   His duties as sergeant included supervising officers, responding to calls for service, and traffic enforcement.

{¶ 5} On May 6, 2023, Sergeant Gallagher noticed a silver Nissan traveling at a "rough speed" over speed bumps in Dayton.   He also noticed that the vehicle did not have its headlights on, which was a violation of the law.   He turned his cruiser around to

follow the vehicle. As he approached the vehicle, which had stopped at a red light, he noticed that a slice of pizza was thrown out of the window. Sergeant Gallagher initiated a traffic stop. When he exited his police cruiser, he approached the car on the passenger side and made contact with Harris, who was driving the Nissan. He asked Harris why she was driving the way she was, and she responded that the "passenger seat was wet or something like that." *Id.* at 8. He noticed that her eyes had a reddish color to them and "appeared to be kind of, like glossy or watery." *Id.* Harris did not have a valid driver's license at the time of the traffic stop. Sergeant Gallagher ordered her out of the vehicle. He described Harris as kind of argumentative and verbally combative. He noticed "[a]t one point she did briefly kind of go off balance." *Id.* Sergeant Gallagher asked Harris if she would be willing to submit to standard field sobriety tests, but she declined.

{¶ 6} On cross-examination, Sergeant Gallagher testified that he initiated the traffic stop around 2:30 a.m. due to the fact that the car's headlights were not illuminated. Harris had appropriately stopped at a red light and gone forward when the light turned green. He did not cite her for failing to maintain her lane, and she was able to bring the vehicle to a stop after he activated his police cruiser's overhead lights. He could not recall if he had cited her for any traffic violation. When he approached Harris's vehicle on the passenger side, he noticed that the rear passenger window was down, but the front passenger window was up. He opened the passenger door to talk to Harris. She was able to retrieve identification from her purse when he asked for it.

{¶ 7} In total, three officers responded to the scene. As Harris was standing

outside the car, "[s]he wasn't necessarily swaying. She was kind of walking around. I don't know if it was necessarily in circles, but she was talking [sic] multiple steps in kind of various directions." *Id.* at 15. During that time, Sergeant Gallagher was asking her questions, and Harris was "making multiple statements and saying different things." *Id.* Sergeant Gallagher did not indicate in the police report that he had smelled an odor of alcohol. Rather, he noted that Officer Puderbaugh later informed him that he had smelled an odor of alcohol coming from Harris while he read her the BMV 2255 form. Sergeant Gallagher did not recall Harris having any slurred speech.

**{¶ 8}** Officer Corey Puderbaugh then testified as follows at the suppression hearing. *Id.* at 19-31. He had worked for the City of Dayton as a patrol officer for approximately two years. On May 6, 2023, he was working the night shift from 8:30 p.m. to 6:30 a.m. Officer Ronnie Taylor was riding with him in the police cruiser. They were dispatched to assist Sergeant Gallagher. Officer Puderbaugh observed Sergeant Gallagher approach the passenger side of Harris's vehicle and Officer Taylor approach the driver's side, and then they both spoke to Harris. She was ordered out of the car, handcuffed, and placed in the back of Officer Puderbaugh's cruiser. Officer Puderbaugh testified as follows regarding what he noticed as Harris exited her vehicle:

Q     And as Ms. Harris was getting out of the vehicle, did you notice anything about her demeanor or her person?

A     Yeah, I did. Slurred speech. She exited the vehicle; she was stumbling. As she was placed in the back of my cruiser, I could smell alcoholic beverage on her breath, glossy eyes, and just slurred speech.

Q.      You've indicated that when you placed Ms. Harris in your cruiser you noticed an odor of alcohol coming form [sic] her person.   How would you characterize that odor?

A       It was strong, like a - - like she could've been, like, just drank something - - any type of alcoholic beverage.

*Id.* at 21.   After Harris was placed in the back of Officer Puderbaugh's cruiser, he read her the incorrect Administrative License Suspension BMV 2255 form.   He later read her the correct BMV 2255 form.

**{¶ 9}** On cross-examination, Officer Puderbaugh testified that when Harris was initially placed in the back of his cruiser, Harris was being detained for an investigatory purpose.   When he read her the correct BMV 2255 form, Harris stated that she would take a test.   Officer Puderbaugh subsequently testified that, at the point when he was reading her the BMV 2255 form, she was being arrested.   He first noticed the smell of alcohol when he was patting her down in preparation for putting her in the back of the police cruiser.   At that time, she was already in handcuffs with her hands behind her back.   According to Officer Puderbaugh, it was Sergeant Gallagher's investigation, and he was just there to assist.

**{¶ 10}** The State introduced the video footage from the body cameras of Officer Puderbaugh and Sergeant Gallagher and the dashboard camera of Sergeant Gallagher. These videos showed the following sequence of events.   Sergeant Gallagher began following Harris's vehicle when he felt she was going at a "rough speed" over some speed bumps.   While he was following her, she went outside her lane of traffic once to avoid a

vehicle that was in her lane of travel attempting to turn left against traffic. Sergeant Gallagher's patrol car then pulled behind Harris's vehicle while she was stopped properly at a red traffic light. After Harris turned left at the light, Sergeant Gallagher activated his overhead lights and initiated a traffic stop. Harris immediately turned right into a parking lot and turned off her vehicle.

{¶ 11} Sergeant Gallagher exited his vehicle and approached Harris's car on the passenger side. After asking Harris to roll her window down, he opened her passenger side front door. He asked Harris why she was driving like she was. She responded that she thought her cousin had left something in her car and she reached over to her passenger seat and noticed it was wet. Sergeant Gallagher did not ask any questions about whether Harris had been drinking. Rather, he asked her for her identification, and she retrieved an ID from her purse and gave it to him. In response to questioning, Harris explained that it was her vehicle, but it was registered in her aunt's name. Sergeant Gallagher then returned to his police cruiser.

{¶ 12} Sergeant Gallagher spent a few minutes using his cruiser's computer to look up information about Harris and the car she was driving, and he spoke with dispatch over his radio. Officer Puderbaugh and his partner then arrived at the scene. Sergeant Gallagher explained to them that Harris had been driving without her car's headlights illuminated and he thought at first that she may have been fleeing from him. He told them that she was "DUS," that he had noticed her eyes were glossy, and "I think she's probably intoxicated." Sergeant Gallagher stated that he intended to ask her to perform field sobriety tests and that he had not yet had a good opportunity to smell her for alcohol

but would when he returned to her vehicle. He also noted that she was "super super suspended."

{¶ 13} The three officers approached Harris's vehicle, two on the driver's side and one on the passenger's side. Sergeant Gallagher asked Harris to step out of the vehicle. She immediately exited the vehicle but then leaned back in to retrieve the keys to the vehicle. Harris immediately began questioning why there were three officers around her when she had not done anything and had no warrants out on her. Sergeant Gallagher informed Harris that he suspected she was intoxicated and asked her if she would perform field sobriety tests. Harris responded that she was not intoxicated and was just trying to go home. She refused to perform any field sobriety tests. After Sergeant Gallagher instructed her to put her hands behind her back, Officer Puderbaugh handcuffed her. Sergeant Gallagher explained to her that he thought she was intoxicated based on her eyes, her driving, and her behavior. He then retrieved her phone from her pocket, took a quick look at the screen, began looking under the driver's side front seat of her car, and then opened up and looked in the middle console compartment.

{¶ 14} Officer Puderbaugh escorted Harris back to his police cruiser. Sergeant Gallagher told the third police officer to begin inventorying Harris's vehicle and to have Officer Puderbaugh read her the BMV 2255 Form. Sergeant Gallagher then spoke with dispatch and asked the operator to check whether Harris had any prior convictions for operating a vehicle while under the influence (OVI).

{¶ 15} After Officer Puderbaugh read her the BMV 2255 forms, Sergeant Gallagher spoke again with Officer Puderbaugh. According to Officer Puderbaugh, Harris had

changed her mind and agreed to take field sobriety tests. Sergeant Gallagher stated that he did not feel comfortable giving her field sobriety tests at this point. Sergeant Gallagher noted her eyes and that she was tipping over when she got out of the car. Officer Puderbaugh then stated for the first time that he smelled alcohol on her. Officer Puderbaugh explained that she had refused the chemical test so they would just take her in for the OVI then. The dispatch then informed Sergeant Gallagher that Harris had prior OVI convictions.

{¶ 16} On June 5, 2024, the trial court issued a decision granting Harris's motion to suppress. The trial court found that "at [the] time of the arrest there was no indication of 'any' odor of alcohol; no field sobriety tests inasmuch as the officer read the wrong BMV 2255 form and there was no further evidence of probable cause for arrest. The exhibits do no[t] display any indicia of the Defendant being under the influence of alcohol at the time of her arrest." Therefore, the trial court concluded that there was no probable cause to arrest Harris and dismissed the case. The State filed a timely notice of appeal.

II.    The Trial Court Did Not Err in Granting the Motion to Suppress

{¶ 17} The State's sole assignment of error is:

There was probable cause supporting Harris' OVI arrest. The trial court erred, therefore, in sustaining Harris' motion to suppress.

{¶ 18} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 2003-Ohio-5372, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best

position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist. 1997).

{¶ 19} The State argues that the police officers testified to Harris's glassy eyes, stumbling, refusal to take field sobriety tests, and inappropriate answers to questions, as well as the strong odor of alcohol. According to the State, the officers' testimony was corroborated by the two videos that were entered into evidence at the suppression hearing. Therefore, the State contends "[t]he trial court's finding that there were no signs of intoxication is not supported by competent, credible evidence because the record reveals there were multiple signs of intoxication." Appellant's Brief, p. 7.

{¶ 20} Harris responds that, at the time of her arrest, the only physical sign present of potential intoxication was glossy eyes. She contends that no odor of alcohol was detected by any officer prior to her arrest. Harris further argues that there was no stumbling or slurred speech and, although argumentative, Harris appropriately responded to the questions being asked of her.

{¶ 21} "Probable cause is a stricter standard than reasonable and articulable suspicion." *State v. Mays*, 2008-Ohio-4539, ¶ 23, citing *State v. Evans*, 67 Ohio St.3d 405, 411 (1993). "A warrantless arrest that is based upon probable cause and occurs in

a public place does not violate the Fourth Amendment."  *State v. Brown*, 2007-Ohio-4837, ¶ 66, citing *United States v. Watson*, 423 U.S. 411 (1976).  "Probable cause to arrest exists when a reasonably prudent person would believe that the person to be arrested has committed a crime."  *State v. Adams*, 2011-Ohio-4008, ¶ 7 (2d Dist.), citing *State v. Timson*, 38 Ohio St.2d 122 (1974).  "Ohio decisions have interpreted this definition to include the 'totality' of facts and circumstances surrounding the arrest." (Citations omitted.)  *State v. Brandenburg*, 41 Ohio App.3d 109, 111 (2d Dist. 1987).

{¶ 22} The offense for which Harris was arrested is defined as follows: "No person shall operate any vehicle, streetcar, or trackless trolley within this state, if, at the time of the operation, any of the following apply: (a) The person is under the influence of alcohol, a drug of abuse, or a combination of them."  R.C. 4511.19(A)(1)(a).

{¶ 23} Before analyzing the totality of the circumstances, we must first acknowledge that an argument could be made that no probable cause for arrest for OVI was necessary, because Harris could have been arrested for driving under suspension. However, the State did not make this argument.  Further, Harris was required to submit to a chemical test for the presence of alcohol in her body, subject to a license suspension upon refusal.  As we have noted previously, probable cause to believe Harris was operating a motor vehicle under the influence was necessary to request her to submit to the chemical test, separate and apart from the probable cause needed to arrest her. *State v. Atkinson*, 2004-Ohio-776, ¶ 37 (2d Dist.).

{¶ 24} We have reviewed State's Exhibit 1, which includes the video footage from both the dash camera of Sergeant Gallagher's police cruiser and his body camera, and

State's Exhibit 2, which includes video footage from the body camera of Officer Puderbaugh. Based on our review of the footage, we agree with the trial court that the video evidence did not provide sufficient "indicia of the Defendant being under the influence of alcohol at the time of her arrest."

{¶ 25} The video evidence and testimony presented at the suppression hearing established that Sergeant Gallagher was the police officer who initiated the traffic stop, the officer in charge of the investigation during the traffic stop, and the officer who made the decision to arrest Harris. While Sergeant Gallagher was following Harris's vehicle in his cruiser, there were no clear signs of erratic driving but for one instance where Harris had to swerve out of the way of a truck that was improperly sitting in her lane while attempting to turn left across her lane. Sergeant Gallagher similarly was forced to swerve around this stationary truck. After Harris was pulled over and was being questioned by the police officers, she often interrupted and disagreed with what the police officers were saying. However, the video does not show her losing her balance or stumbling after she exited her vehicle. Also, there was no clear sign of slurred speech in the videos despite the fact that she made several statements to the police officers in response to their questions. Further, our review is somewhat hampered by the fact that the police officers did not ask many predicate questions to determine whether Harris had consumed alcohol or an illegal substance earlier that night. Rather, Sergeant Gallagher appears to have decided Harris was intoxicated during his initial, limited interaction with Harris prior to the other two officers' arrival at the scene. As a result, Sergeant Gallagher did not ask a series of predicate questions that would have been helpful to gain a better

grasp of whether Harris was showing the well-established signs of someone who was under the influence.

{¶ 26} While the video footage and hearing testimony established that Officer Puderbaugh stated he smelled a strong odor of alcohol on Harris during a pat down he conducted, he did not discover this potential evidence until after Harris was already under arrest. At the time he noticed the strong odor of alcohol, Harris had already been handcuffed behind her back, and Sergeant Gallagher had instructed Officer Puderbaugh to read her the BMV 2255 form. "The language of R.C. 4511.191 specifically provides that an arrest is necessary prior to reading BMV Form 2255 and requesting alcohol testing from a suspect." *Village of Gates Mills v. Wazbinski*, 2003-Ohio-5919, ¶ 28 (8th Dist.). Under the specific facts in the record before us, it is clear that Harris was under arrest before Officer Puderbaugh conducted the pat down of Harris. Further, Sergeant Gallagher, who was in charge of the investigation and was near Harris during his questioning of her outside the vehicle, testified that he did not notice any smell of alcohol. He also testified that he did not notice any slurred speech from Harris.

{¶ 27} Based on the totality of the circumstances surrounding the arrest, we conclude the trial court did not err in finding that the officers lacked probable cause to arrest Harris based on a suspicion of OVI. Therefore, the trial court properly granted the motion to suppress.

{¶ 28} The sole assignment of error is overruled.

III.    Conclusion

{¶ 29} Having overruled the State's assignment of error, we will affirm the judgment of the trial court.

. . . . . . . . . . . . .

WELBAUM, J. and HUFFMAN, J., concur.